UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AMY MACDONALD-BASS,

        Plaintiff,

                                                                               Case Number 09-11445-BC

v.                                                        Honorable Thomas L. Ludington

JE JOHNSON CONTRACTING, INC.,

        Defendant.
_____/

**<u>OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT WITH PREJUDICE</u>**

Plaintiff Amy McDonald-Bass filed a three-count complaint on April 17, 2009, arising out of the termination of her employment on or about June 18, 2008, by Defendant JE Johnson Contracting, Inc. Plaintiff alleges claims for discrimination based on gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101-.2804, and for retaliation in violation of the Michigan Worker's Disability Compensation Act ("WDCA"), Mich. Comp. Laws §§ 418.101-.941.

Now before the Court is Defendant's motion for summary judgment [Dkt. # 21], filed on May 14, 2010. Plaintiff filed a response [Dkt. # 23] on June 4, 2010; and Defendant filed a reply [Dkt. # 24] on June 11, 2010. The Court has reviewed the parties' submissions and finds that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. E.D. Mich. LR 7.1(e)(2). For the reasons stated below, Defendant's motion will be granted.

I

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the opposing party fails to raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

II

Plaintiff is female, approximately thirty-seven years old, 5' 1" tall, and weighs 125 pounds. Defendant is a full service mechanical contractor providing process piping, plumbing, and heating, ventilating, and air conditioning ("HVAC") services. In October 2006, Jim Bass, an employee of Defendant, asked his supervisor, mechanical and general superintendent Ray Johnson, to consider hiring Plaintiff. During his interview with Plaintiff, Johnson expressed concern about Plaintiff's ability to physically lift the weight of the pipe and plumbing products. Plaintiff indicated that she did not want any special treatment and stated that she could repeatedly lift 50 pounds or more. Ultimately, Johnson "agreed to give the Plaintiff the same opportunity to work at J.E. Johnson as everyone else despite her small physical size and lack of experience." Johnson Aff. ¶ 6, May 13, 2010. When Plaintiff was hired on October 23, 2006, she was the only female employee in the pipefitting department. Johnson Tr. 21-22, Apr. 14, 2010.

Plaintiff began employment as a "helper" at a pay rate of $8.50 per hour for forty hours a week. Her job required her to "safely perform assigned tasks related to the layout and installation of the various system related to commercial, industrial and institutional systems." Def. Br. Ex. E (helper job description). Assigned tasks included, but were not limited to, lifting heavy pipes, retrieving parts, cutting, grinding, beveling a variety of pipings and fittings, painting the back room ceilings, and the overall cleanup of the shop area. Pl. Br. Ex. 4. Plaintiff was required to be able to meet certain physical requirements, including: (1) the ability to stand for prolonged periods of time; (2) the ability to stand and walk throughout project sites and machine shop; (3) a full range of body movements including use of hands to finger, handle, or feel objects, computer equipment and peripherals; (4) the ability to bend, stoop, and crouch; (5) the ability to climb stairs and ladders; (6)

the ability to operate a motor vehicle; (7) a command of the senses of sight, hearing and touch; and (8) the ability to lift up to fifty pound loads. Def. Br. Ex. E.

In February 2007, Plaintiff received a sixty to ninety day performance evaluation. Pl. Br. Ex. 4. Her supervisors noted that her skill level matched her wages, and that the "ABC Wheels of Learning" program would help improve her skills. On March 12, 2007, Plaintiff received a $1.50 per hour wage increase. Pl. Br. Ex. 5. The wage increase form, signed by Plaintiff's supervisor, David Shenkel, noted that Plaintiff was a "fast learner" and "has self motivation to become better in the field." *Id.*

Plaintiff's first full performance evaluation was conducted on March 29, 2007, and signed by Shenkel. Pl. Br. Ex. 6. Plaintiff's overall performance rating was 82.63%, *id.*, which Johnson confirmed was an "acceptable" rating, Johnson Tr. 43. This evaluation noted that Plaintiff was a "good worker" and "listen's (sic) well to instruction"; however, she needed improvement in areas including "ISO orientation," "hands on fitting skills," "spec reading," and "testing." Def. Br. Ex. E (No. 132).

In April 2007, Plaintiff had a meeting with Johnson and Schenkel, and was offered a position as a pipefitter. During this meeting, Plaintiff was told that Greg Younk, Defendant's Vice President and General Manager, wanted Plaintiff to be the fitter "up front" in the shop area. Pl. Tr. 67, Apr. 13, 2010. Schenkel told Plaintiff that Younk had said "why hire someone when we have somebody capable of doing it." *Id.* Schenkel told Plaintiff that he did not want her to do the job, that he thought it was "ridiculous." *Id.* 68. Yet, Plaintiff testified that during this meeting, no one expressed any concern about her physical ability to do the job, read isometric drawings, or perform other fitter functions. *Id.*

In approximately May 2007, after Plaintiff had finished two semesters at the "ABC" academy, Plaintiff's job classification changed from helper to apprentice pipe fitter one. As a pipe fitter one, Plaintiff had to perform the same basic functions and the same physical demands as for the helper position. She was also required to find fittings for the journeymen, measure and prep welds and fit up welds.

Plaintiff asserts that she was not given the hands-on work needed to learn the trade. After about three months, Plaintiff approached Younk about the issue. Pl. Tr. 69. Plaintiff testified that he said, "I was afraid this was going to happen." Pl. Tr. 70. Younk and Plaintiff then spoke with Johnson and Steven Marker, Operations Manager. *Id.* Johnson told Marker that he did not know why Plaintiff was not being allowed to fit. *Id.* Marker said that he would look into the situation, but Plaintiff contends that nothing happened. *Id.* Every two or three weeks, Plaintiff raised the issue with Johnson and he told her that it was not his responsibility. *Id.* 71.

On August 1, 2007, Plaintiff received a $1.85 per hour wage increase. Pl. Br. Ex. 7. Johnson recommended Plaintiff for the wage increase. Johnson Tr. 45. On the wage increase form, Johnson noted that Plaintiff was a "Level 1 fitter" and "is a good worker who wants to learn." Pl. Br. Ex. 7. Johnson testified that Defendant placed Plaintiff with a mentor, journeyman Kevin Roberson, to see if he could assist her in improving her performance. Johnson Tr. 34. Johnson testified that Plaintiff seemed unable to retain the information provided by Roberson and Plaintiff continued to have performance problems identifying specific fittings and interpreting ISO drawings as well as lifting the bigger bore piping. *Id.* Johnson discussed these concerns with Plaintiff. *Id.*

Defendant again praised Plaintiff in her September 2007 evaluation, but noted that Plaintiff needed to improve in certain areas, including "tracing," "testing," "flame cutting," "specs &

P&ID's," "ISO reading," and "layout." Def. Br. Ex. E (No. 115). The evaluation noted that Plaintiff had improved in "reading ISO's" and "layout." *Id.* The evaluation notes that Plaintiff "would like more opportunity to get out of the back room" and "wants to learn more fitting skills." *Id.* Plaintiff asserts that male employees, such as Jake Rowley, were permitted to perform pipefitting duties, advancing past Plaintiff in their skills because they were permitted to obtain hands-on experience.

Defendant emphasizes that the job took a physical toll on Plaintiff and highlights the following medical evidence:

> 08/14/2007 . . . Right-sided shoulder pain . . . chronic right shoulder pain over the past half year or so if not prior to that . . . As a whole, I suspect this is more of an overuse injury rather than any specific trauma. She denies any specific injuries or accidents. She has a lot of problems with her right shoulder specifically with any abduction and adduction . . . A lot of specific things that aggravate her including grinding, etc. . . .
>
> 05/30/2007 . . . Right shoulder pain . . . this has been going on for some time, probably a few months . . . the past several weeks it has been worsening . . . She notices taking off her shirt or lifting the right arm hurts. She did have one episode of numbness in all the fingers of her right hand about 1 week ago . . . She has not had any specific injury . . . She notes she is often having to put large pipes on that shoulder . . .
>
> 01/30/2007 . . . Upper back pain . . . denies any specific trauma . . . doing a lot of very heavy lifting . . . she knew that it would cause some irritation and that she has had similar problems in the past . . . left upper shoulder and lower cervical spine . . . have been tender today and the last 3 or 4 days the right side has been exquisitely tender . . . fiancé has been massaging it . . . she does have some trigger point muscle spasms, right greater than left . . .

Def. Br. Ex. E (No. 277-79); Pl. Tr. 43-44.

On January 30, 2008, Plaintiff informed safety director Laraway that she was having "cramping in [her] right shoulder, [and] pain on the right side of [her] neck." Def. Br. Ex. E (No. 813). Plaintiff also complained of "headaches" that made "[her] eyes hurt" and her "fingers tingle on [her] right hand when [her] shoulder is hurting." *Id.* Plaintiff told Laraway that her arm and shoulder pain was limiting her ability to fully raise her arm. *Id.* (No. 847) (claim event summary).

-6-

When Laraway asked Plaintiff how long the pain had been bothering her, she replied about a month, but it had become worse in the last couple weeks. *Id.* Plaintiff then explained that the pain was so bad on January 22, 2008 that she was forced to leave work early. *Id.* She also stated that she was unable to work on January 23, 2008, since she could not get out of bed due to the muscle spasms she was having up her back and over her neck. *Id.* Plaintiff also mentioned that she had been treated for the same problem approximately two months earlier. *Id.* After hearing Plaintiff's complaints, Laraway sent Plaintiff to Urgent Care in Midland for care. *Id.* Plaintiff was diagnosed with tendonitis and cervical strain. *Id.* The doctor imposed restrictions of no lifting, pushing, or pulling greater than five pounds. *Id.*

As a result of her restrictions, Defendant placed Plaintiff off work on January 30, 2008. *Id.* Defendant provided Plaintiff an employee's report of claim for worker's compensation benefits. *See id.* (No. 813). This was the third time that Defendant had done so. On January 31, 2008, Defendant prepared an employer's basic report of injury for Plaintiff. *See id.* (No. 846). Defendant's insurance carrier authorized Plaintiff to receive medical treatment and medications. Pl. Tr. 105-06.

While Plaintiff was on leave, on February 21, 2008, she was given a $1.00 per hour wage increase. Pl. Br. Ex. 9; Johnson Tr. 50. On the wage increase form, it was noted that Plaintiff had a "good desire to learn the trade." On March 24, 2008, Defendant evaluated Plaintiff's job performance as a pipe fitter one for the time period of September 1, 2007 through March 1, 2008. Def. Br. Ex. E (No. 81). Plaintiff's overall rating was 80.33%. *Id.* It was noted that Plaintiff continued to have problems with "ISO reading/orientation," "layout/mathematics," "specs and P& ID's," "threaded piping/lined piping/takeoff," "material identification &count," and "teamwork." *Id.* (No. 96).

In May 2008, Plaintiff was cleared to return to work without restrictions. Defendant asserts, however, that it had little work and was in the process of reducing the workforce, and that on May 19, 2008, it laid Plaintiff off. Johnson Tr. 52-53. Other male pipefitters were also laid off including Richard Libera, Austin Hammond, and Nick Witzke. Johnson Aff. ¶ 23.

In June 2008, Johnson informed her that she would not be called back from lay off "due to her inability to perform her necessary job duties." Johnson Aff. ¶ 4. At a meeting with Plaintiff and Keri Prybynski, a human resources representative, Johnson told Plaintiff that her employment was being terminated because she did not meet the physical requirements of the job. Pl. Tr. 14. Plaintiff testified that Johnson threw up his hands and said, "you're going to get hurt, Amy, in this job." Pl. Tr. 14.

Johnson contends that it initially appeared that Plaintiff "was a good entry level worker who wanted to learn." Johnson Aff. ¶ 12. Then, "even after Plaintiff took the ABC training, it became apparent that Plaintiff needed assistance and improvement in isometric diagrams (three dimensional drawings), reading orientation, lay/mathematics, sec's P&ID's, handling piping and materials, threaded piping/lined, piping take off, material identification & count, team work and to focus on her job and now what others around her were doing." *Id.* ¶ 13. At some point, Plaintiff was enrolled in and eight week enhancement program to try to help her with being able to read and properly implement isometric drawings used in the pipe fabrication process. *Id.* ¶ 14. The enhancement program instructor told Plaintiff, "I have to be honest with you. This is way over your head." Pl. Tr. 154-556. Plaintiff agreed. *Id.*

Johnson maintains that his decision to terminate Plaintiff's employment

> took into account Plaintiff's coworkers concerns about Plaintiff's inadequate work performance and their concerns that she was not able to properly perform the job. This

included them describing Plaintiff as a "bottleneck" and "stumbling block" in the pipe fabrication process at JEJ. They informed me that Plaintiff's co-workers repeatedly had to step in and do her job for her which took them away from their jobs. My observation of Plaintiff was that she had serious short comings in performing the pipe fitter job.

*Id.* ¶ 10. Johnson specifically identified Kevin Roberson and Kirk Shankel as having described Plaintiff as a bottleneck. *Id.* ¶ 18. They also "reported that other coworkers had to do a lot of the lifting of heavy pipe materials for Plaintiff and they found it necessary to show her how to put the materials together before they could do their welding jobs. *Id.* Johnson stated that "[w]hen Plaintiff was supposed to be helping her coworkers, including the welders, with preparing piping for assembly and welding, she would complain about her job including, but not limited to, that the grinder hurt her hand, that she could not carry heavy materials." *Id.* ¶ 19.

Plaintiff testified that she had a coworker, Quincy, do the heavy lifting of pipes because "he was so much stronger than me to do that," but also because he "didn't like cleaning parts" or "running the grinder." Pl. Tr. 164. Defendant also advances the affidavit of Melissa Mantooth, a female pipefitter-welder who was assigned to Defendant by an employment agency from about August 13, 2007 to December 14, 2007, describing a time when Plaintiff used the wrong type of piping, resulting in the loss of time and other resources. Mantooth Aff. ¶ 9, May 5, 2010. Mantooth states that "[t]his as not a one time occurrence." *Id.* She further states that "although the Plaintiff was permitted to attempt different job tasks, she did not have the ability to do the heavy lifting or work at the same speed or do the same job tasks that the other workers in the pipe fabrication shop did." *Id.* ¶ 8.

At some point, safety director Bob Laraway expressed concern to Johnson regarding Plaintiff's "physical ability to perform her job and recommended a reevaluation of whether or not she could safely work as a pipe fitter or helper within the job description." Johnson Aff. ¶ 17.

Similarly, Younk testified that Dan Ratell, the Human Resources Manager, expressed concern as to whether Plaintiff "could physically do the job or not." Younk Tr. 15.

On February 27, 2009, Defendant sent Plaintiff a letter containing an unconditional offer to return to work at Defendant as a pipefitter. Def. Br. Ex. K. Plaintiff did not accept the offer. Pl. Tr. 143-44. As of March 3, 2009, Plaintiff admitted that her shoulder pain "never really improved," that she was laid off from work on June 17, 2009 due to not meeting physical requirements and that she could not physically work as a pipefitter. Def. Br. Ex. E (No. 271) (medical records); Pl. Tr. 33. On July 1, 2009, Plaintiff had right shoulder surgery. Def. Br. Ex. E (No. 317); Pl. Tr. 81-82. Plaintiff asserts that after her surgery, she could have physically performed pipefitter job duties as of January 2010. Pl. Tr. 82-83.

III

With respect to Plaintiff's Title VII and ELCRA claims, Defendant contends that it is entitled to summary judgment because Plaintiff cannot establish a prima facie case of gender discrimination when she was not qualified for the pipefitter position and other similarly situated males were not treated more favorably. Defendant also contends that Plaintiff cannot establish that Defendant's proffered reason for terminating her employment was pretextual. With respect to Plaintiff's WCDA retaliation claim, Defendant contends that it is entitled to summary judgment because Plaintiff cannot establish a causal connection between a worker's compensation claim filed by Plaintiff and Defendant's decision to terminate her employment.

A

Plaintiff's complaint alleges that Defendant's decision to terminate her employment was based on her gender, in violation of Title VII and the ELCRA. Title VII makes it unlawful for an

employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] . . . sex." 42 U.S.C. § 2000e-2(a)(1). ELCRA similarly prohibits the discharge of an employee based on his or her sex. Mich. Comp. Laws § 37.2202(1)(a).

A plaintiff can establish a claim for unlawful discrimination under both Title VII and the ELCRA either by producing direct evidence that a materially adverse employment decision resulted from intentional discrimination or by presenting a prima facie case of discrimination under the *McDonnell Douglas Corp. v. Green* burden shifting framework. 411 U.S. 792, 802-03 (1973). Plaintiff does not allege that there is any direct evidence that Defendant terminated her employment because of her gender. Thus, she must proceed according to the *McDonnell Douglas* paradigm.[1]

First, a plaintiff must demonstrate that the decision to terminate her employment was based in part on her gender. She can do so by demonstrating she is a member of a protected class, she was subject to a materially adverse employment action, she was qualified for the job, and that she was replaced by an employee who was not a member of the protected class or, alternatively, that similarly situated employees from outside the protected class were treated more favorably. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

If she succeeds in demonstrating a prima facie case, the burden shifts to the employer to present legitimate nondiscriminatory reasons for the adverse employment decision. *Vincent*, 614 F.3d at 494; *see also McDonnell Douglas*, 411 U.S. at 802-05. Finally, the burden returns to the

---

[1] It is appropriate to consider Plaintiff's Title VII and ELCRA claims together at the summary judgment phase because the *McDonnell Douglas* framework for analyzing employment discrimination cases applies both. *Thomas v. Hoyt, Brumm & Link, Inc.*, 910 F.Supp. 1280, 1286 (E.D. Mich.1994) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)); *see also Lytle v. Malady*, 579 N.W.2d 906 (Mich. 1998).

plaintiff, who must show that the employer's proffered reasons for the decision were pretextual. *McDonnell Douglas*, 411 U.S. at 802-05; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

Even when a plaintiff establishes a prima facie case under the burden-shifting framework of *McDonnell Douglas*, the plaintiff must ultimately prove that she was a victim of intentional discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). Accordingly, in the summary judgment context, "a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir.1994)).

(1)

Defendant argues that Plaintiff cannot establish the third element of a prima facie case of gender discrimination because she was not qualified for the position when she did not meet Defendant's "reasonable expectations," citing *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 548-49 (6th Cir. 1991) (quoting *McDonald v. Union Camp Corp*, 898 F.2d 1155, 1160 (6th Cir. 1990)). In *McDonald*, the plaintiff "acknowledge[d] that his supervisors were dissatisfied with his job performance . . . when he was discharged," but argued that they "made too big a deal of his alleged 'people problems.' " 898 F.2d at 1160. With respect to determining whether the plaintiff was "qualified," the court explained that "the aim is not to review bad business decisions, or question the soundness of an employer's judgment." *Id.* Thus, based on the plaintiff's concession that his supervisors were not satisfied with his performance, the court found that the plaintiff could not establish that he was "qualified" for the position. *Id.*

Here, Defendant contends that Plaintiff was unable to perform the essential job duties and created a "bottleneck" on work efforts. Defendant emphasizes that Plaintiff agreed with Defendant's assessment that an essential part of the job was "way over your head." Defendant also notes that it provided Plaintiff opportunities to correct documented shortcomings.

In response, Plaintiff contends that Defendant's argument that Plaintiff was not qualified for her position is contradicted by Defendant's own actions and documents. She emphasizes that Plaintiff's performance evaluations demonstrate that she received "acceptable" ratings of 82.63% and 80.33%, and that she was described as a "good worker who wants to learn," and had a "good desire to learn the trade." Johnson testified that he had discretion to withhold pay increases if he felt an employee was not performing properly; yet, he consistently approved, and even recommended, wage increases for Plaintiff.

While Defendant emphasizes that Plaintiff's performance evaluations document areas needing improvement, they also document Plaintiff's request for hands-on pipefitting work. Johnson acknowledged that any employee who is hired without experience had to be permitted to perform the work in question in order to get experience and learn the job. Johnson Tr. 27, 28. In addition, Plaintiff emphasizes that there is no notation on any of Plaintiff's performance evaluations indicating that she was unable to meet the physical demands of the job.

While it is a close question, Plaintiff has raised a genuine issue of material fact as to whether she was qualified for the position. It is unclear to what extent Plaintiff's performance weaknesses dictate that she was not "qualified" for the position when, ultimately, she received ratings of "good" or "acceptable" on all of her performance evaluations. The words "good" and "acceptable" suggest that Plaintiff was meeting Defendant's "reasonable expectations." While an employer certainly may

make the business decision that even a "good" or "acceptable" employee should be discharged, it does not automatically follow that such an employee is not "qualified" for the position. Defendant has not established, as a matter of law, that Plaintiff, an employee that it described as "good" or "acceptable," did not meet its "reasonable expectations."

(2)

Defendant also argues that Plaintiff cannot establish the fourth element of a prima facie case of gender discrimination because she cannot demonstrate that similarly situated male employees were treated more favorably. To satisfy the similarly situated requirement, a plaintiff must show that the suggested comparable employee is similar in "all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citations omitted) (emphasis in original). The relevant aspects include whether the plaintiff and the comparable employee: (1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citations omitted).

Plaintiff contends that she was treated differently than a male employee, Jake Rowley, in that he was permitted to get hands on work experience while Plaintiff was not. Plaintiff testified that she was told that she could not be considered for fitting work until she had completed the ABC program, yet Rowley was not attending school and had only been employed by Defendant for a short period of time. Pl. Tr. 56.

Defendant contends that Plaintiff is not similarly situated to Jake Rowley because he had experience fabricating and making metal products as well as "quite a bit of welding experience" before he was hired. Johnson Tr. 38. Defendant asserts that Rowley did not have any performance

problems, and specifically, did not cause a bottleneck, have problems retaining what he was taught, or lack physical strength required for the job. *See* Johnson Aff. ¶ 22. Defendant contends that Plaintiff's subjective beliefs regarding Rowley are "wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell*, 964 F.2d at 585.

In addition, Plaintiff contends that Duane Prather, a male pipefitter, was treated more favorably. Plaintiff emphasizes that Johnson testified that he discharged Plaintiff because "I didn't feel that she was learning the trade, she was having issues with physical capabilities working with the bigger bore pipe and stuff, . . . and I just felt it was in her better interest, and mine." Johnson Tr. 56. However, Johnson also testified that Prather, who also suffered a work-related injury and received workers' compensation, was not discharged, even though Johnson admitted that he "very much so" had concerns about Prather's ability to perform his job duties. Johnson Tr. 61.

Defendant responds that Prather has not attempted to return to work from medical leave. Moreover, just as Defendant concluded that it could not accommodate Plaintiff's five-pound lifting restriction, it concluded that it could not accommodate Prather's twenty-pound lifting restriction.

Based on the above, Plaintiff cannot establish the fourth element of a prima facie case, that similarly situated male employees were treated more favorably, because Prather was not treated more favorably when he is currently on medical leave and Rowley is not similarly situated when he had prior work experience and no documented performance problems.

(3)

Even if Plaintiff could establish a prima facie case of age discrimination, Plaintiff cannot establish that Defendant's proffered reasons for terminating her employment are pretextual. To prove pretext, a plaintiff must show that the defendant's proffered reason for terminating her

employment either: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). *See also Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008); *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). In order to show that the defendant's proffered reason did not actually motivate the defendant's challenged conduct, the plaintiff must show that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext or coverup." *Abdulnour v. Campbell Soup Supply Co. LLC*, 502 F.3d 496, 503 (6th Cir. 2007) (citations and quotations omitted).

Here, Defendant emphasizes that as long as it had "an honest belief in its proffered non-discriminatory reason for discharging [Plaintiff], [Plaintiff] cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted). In other words, "when an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.' " *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quotation omitted). Thus, "[a]n employee's opinion that [s]he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor." *Stockman v. Oakcrest Dental Ctr. P.C.*, 480 F.3d 791, 802 (6th Cir. 2007) (citation omitted).

Defendant contends that it, through Johnson, made a "reasonably informed and considered decision." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1993). Defendant asserts that it

reasonably believed that Plaintiff was not meeting job expectations, as reported by her mentor, confirmed by her coworkers on her shift, documented in her performance evaluations, and Plaintiff's admission that parts of her job were over her head. Defendant also contends that the "same actor inference" applies to this case, creating a powerful evidentiary inference of non-discrimination, citing *Town v. Mich. Bell Tel. Co.*, 568 N.W.29 64, 70 (Mich. 1997), and *Hartsel v. Keys*, 87 F.3d 795, 804 n.9 (6th Cir. 1996). Defendant emphasizes that Johnson both hired and fired Plaintiff.

In response, Plaintiff contends that she has established pretext because Defendant has "shifted" the reasons for her discharge, citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 591-92 (6th Cir. 2002). Plaintiff contends that at her discharge meeting, Johnson told her that she was being discharged because she was "going to be hurt," but Defendant now maintains that Plaintiff was not learning the trade and that there were concerns regarding her physical ability to do the job. Plaintiff also asserts that Defendant's assertion that Plaintiff was unable to perform her job duties is inconsistent with her performance evaluations and wage increases.

Although Johnson's statement that Plaintiff was "going to be hurt" is not identical to the reasons that Defendant has now set forth for terminating Plaintiff's employment, whether Defendant was concerned that Plaintiff was "going to be hurt," and whether Defendant was concerned about Plaintiff's overall performance are interrelated. That is, part of Plaintiff's performance problems stemmed from her apparent lack of physical abilities. Importantly, there is evidence in the record that corroborates Defendant's concerns regarding Plaintiff's performance – Defendant has not just now raised the issue. Plaintiff has advanced no evidence to suggest that Defendant terminated her employment based on her gender, rather than on its assessment of her physical and mental capabilities. Ultimately, the evidence of record does not allow the conclusion that "a jury could

reasonably reject the employer's explanation for its decisions." *See Kocsis*, 97 F.3d at 883. Thus, Defendant is entitled to summary judgment on Plaintiff's gender discrimination claims.

B

The WDCA provides the exclusive remedy under Michigan law for a qualified employee who is injured on the job to be compensated by his or her employer. Mich. Comp. Laws §§ 418.101-.941. Indeed, an employee injured on the job is entitled to payment from his or her employer regardless of fault. Mich. Comp. Laws § 418.301(1). The statute further provides that an employer "shall not discharge an employee or in any manner discriminate against an employee . . . because of the exercise by the employee on behalf of himself of herself or others of a right afforded by" the WDCA. Mich. Comp. Laws 418.301(11).

A plaintiff claiming retaliation bears the burden to demonstrate that "there was a causal connection between the protected activity, i.e., the filing of h[er] worker's compensation claim, and the adverse employment action." *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 404 (Mich. Ct. App. 1999) (per curiam) (citing *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661 (Mich. Ct. App. 1997)). Importantly, "retaliatory discharge premised upon the employer's anticipation of a future claim does not state a legally cognizable cause of action." *Wilson v. Acacia Park Cemetery Ass'n*, 413 N.W.2d 79, 83 (Mich. Ct. App. 1987) (citation omitted); *Griffey v. Prestige Stamping, Inc.*, 473 N.W.2d 790, 792 (Mich. Ct. App. 1991) (per curiam).

Here, Defendant contends that Plaintiff cannot establish a causal connection between her filing of a worker's compensation claim and her discharge because Plaintiff concedes that her claim is premised on Johnson's alleged statement that he believed that she would get hurt if she continued to work as a pipefitter for Defendant. Thus, Defendant contends that Plaintiff's claim is based upon

Defendant's alleged fear of a "future claim" and is not actionable under Michigan law.

In response, Plaintiff emphasizes the temporal proximity of just a few weeks between when she was cleared to return to work without restrictions and when she was discharged. Combined with Johnson's statement that "you're going to get hurt," Plaintiff contends that she can establish a causal connection. Plaintiff acknowledges that "temporal proximity in and of itself is insufficient" to establish a causal connection, but emphasizes that it "tends to indicate" a causal connection, citing *Stephens v. Neighborhood Serv. Org.*, No. 07-11908, 2008 WL 3913926, at *6 (E.D. Mich. 2008) (citing *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 317 (6th Cir. 2001)).

While Plaintiff asserts that her claim is for "retaliation," and not for "anticipation of future claims," the only evidence, other than temporal proximity, advanced by Plaintiff relates to the anticipation of future claims rather than a past claim filed by Plaintiff. Plaintiff does not explain how the statement "you're going to get hurt" is probative of retaliation when it only refers, if to anything, to future claims. Plaintiff has not advanced evidence sufficient to establish a causal connection to a filed worker's compensation claim and Defendant is entitled to summary judgment.

IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 21] is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint [Dkt. # 1] is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington<br>THOMAS L. LUDINGTON<br>United States District Judge

Dated: July 28, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 28, 2010.

        s/Tracy A. Jacobs
        TRACY A. JACOBS